# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

**SUMMER BOISMIER,**

     Plaintiff,

                              Case No. 2023-CV-767-J

vs.


**RYAN WALTERS,**

     Defendant.


## PLAINTIFF'S RESPONSE TO

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT




Respectfully submitted by:

Brady R. Henderson,
Wis. Bar #1116435, Okla. Bar #21212
1009 Glen Oaks, Ste. 109
Mequon, WI 53092
(414) 563-7453
brady@creamcity.law

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………..3

Introduction………………………………………………………………...4

Response to Defendant's Statement of Alleged Undisputed Material Facts………………………………………………………….4

Plaintiff's Proposed Additional Material Facts Precluding Summary Judgment……………………………………………………………..16

Responsive Argument and Authority…………………………………..18

I.    The NY Times "Actual Malice" Standard should not be extended beyond its legitimate scope………………………………………………..18

II.    Whether Defendant acted with "actual malice" remains in dispute……23

III.    Both Defendant's statements and Plaintiff's claims go beyond the scope of the Title 12, §1443.1 statutory privilege Defendant cites…………….25

IV.    The Government Tort Claims Act is inapplicable to the present claims before the court……………………………………………………...26

V.    Defendant's defamatory statements allege false facts rather than remaining within the scope of opinion…………………………………27

VI.    Defendant's defamatory statements go beyond the scope of Fair Comment…………………………………………………………27

Conclusion…………………………………………………………………...28

# TABLE OF AUTHORITIES

12 O.S. §1441……………………………………………………………………………25

12 O.S. §1443.1………………………………………………………………………25, 26

*Buckley v. Valeo,* 424 U.S. 1, (1976)……………………………………………...21

*Garrison v. State of Louisiana,* 379 U.S. 64 (1964)…………………………………...22

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974)……………………………………21, 22

*Johnson v. Corinthian TV Corp.* 1978 OK 88, 583 P.2d 1101 (Okla. 1978)………..18, 19

*Luper v. Black Dispatch Pub. Co,* 1983 OK CIV APP 54, 675 P.2d 1028 (Okla. app. 1983)…………………………………………………………………..20, 24, 25

*Magnusson v. New York Times Co.,* 2004 OK 53………………………………………27

*Meyer v. Grant,* 486 U.S. 414 (1988)………………………………………………21

*NY Times v. Sullivan,* 376 U.S. 254 (1964)…………………………...………18, 19, 20

*Rosenblatt v. Baer,* 383 U.S. 75 (1966)……………………………………………18, 19

*St. Amant v. Thompson,* 390 U.S. 727 (1968)………………………………………24

COMES NOW, Plaintiff Summer Boismier, by and through her undersigned Counsel of record, and responds in opposition to Defendant's Motion for Summary Judgment (Doc. 37) as follows:

## INTRODUCTION

The bulk of Defendant's Motion for Summary Judgment relies chiefly on the same fundamental arguments and analysis as that rejected by the Court when it denied Defendant's Motion to Dismiss near the beginning of the present litigation. Even at this juncture, Defendant's additional proffered facts and authority are not sufficient to allow the Court to grant summary judgment as a matter of law.

## RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGED UNDISPUTED MATERIAL FACTS

Alleged facts proffered by Defendant are in italics, with Plaintiff's respective responses placed below each.

1. *In July of 2022 it was publicized that Tulsa Public Schools had removed the books Gender Queer and Flamer from school libraries. Ex. 1, Sean Murphy, "Tulsa Public Schools removes graphic books from library," The Associated Press, July 28, 2022, (Ex.1).*

Not disputed, but objectionable and inadmissible due to irrelevance and prejudice outweighing any probative value—Defendant cannot show any distribution of either of these works to students (or anyone else for that matter) by Plaintiff, which is what Defendant's orginally defamatory allegations against her relied up. As such, since Defendant's allegation that Plaintiff distributed the alleged "pornography" is false and without factual basis, whether the content she did not actually distributed could have, hypothetically, been considered pornographic

2. *In a public statement from July 27, 2022, Joy Hofmeister, then Oklahoma Superintendent of Public Instruction, described the two books as "sexually explicit material" and "pornography that does not belong in any public school." Ex. 2, Statement of Joy Hofmeister.*

Not disputed, but subject to the same objection as #1, above. Moreover, since Defendant's allegation that Plaintiff distributed the alleged "pornography" is false and without factual basis, whether the content she did not actually distribute could have, hypothetically, been considered pornographic by someone else, had she in fact been distributing it, is of limited to no relevance as a defense to her defamation claim.

3. *At the beginning of the August 2022 school year, Plaintiff was employed as a sophomore English teacher at Norman High School. (Ex. 3, Transcript of Testimony of Summer Boismier before the Oklahoma State Board of Education, June 21, 2023, p. 37, l. 2-8).*

Not disputed.

4. *On August 12, 2022, Plaintiff posted to her public Twitter (now X) account the following statement:*

*HB 1775: Before and after | My [students] no longer have access to books by BIPOC, LGBTQ+, and/or gender non-conforming authors because state leadership has spent the last year loudly labeling these books and their stories/perspectives as pornography, as indoctrination. Ex. 4, August 12, 2022, Twitter post.*

Not disputed.

5. *On the first day of the school semester, August 19, 2022, Plaintiff had posted in her classroom a QR code link to the Brooklyn Public Library's "Books Unbanned" program. (Ex. 3, Transcript, p. 38, l. 5-7; p. 39, l. 2-14).*

Not disputed.

6. *The "Books Unbanned" program includes access to the book Gender Queer and other "banned" books. (Ex. 3, Transcript, p. 43, l. 15-18).*

Not disputed, but incomplete and misleading without at least the following two omitted facts for context: (1) the Books Unbanned program provides "access" merely to the extent it creates a portal for someone to apply for a digital library card for access to the Brooklyn Libraries collection, and (2) the two books mentioned above are merely two works selected by Defendant from within a collection of over 2,500,000 books available for lending. *See* "An Overview of Brooklyn Public Library," at p. 2, (available at https://static.bklynlibrary.org/prod/public/documents/Development/FY24_ SHORT_A_links.pdf)

7. *At the time that Plaintiff posted the QR code, she was aware of Walters public commentary on Gender Queer. Posting the QR code to "Books Unbanned" was part of her reaction to that commentary. (Ex. 3, Transcript, p. 43, l. 19-24).*

Not disputed.

8. *The book Gender Queer includes graphic depictions and discussions of sex, oral sex, and masturbation. (Ex. 5, Excerpts from Gender Queer).*

Not disputed, but subject to the same objections as Plaintiff makes to #2 and #3, above.

9. *In response to a complaint from a parent, Plaintiff was "removed" from her classroom by Norman Public Schools. (Ex. 3, Transcript. p. 42, l. 24 – p. 43, l. 2).*

   Not disputed.

10. *Plaintiff then resigned from her position. (Ex. 3, Transcript. p. 43, l. 5-9).*

    Not disputed.

11. *On August 23, 2022, Oklahoma City FOX 25 published a story about Plaintiff titled "NPS teacher resigns from district after sharing QR code for library access with classroom" on okcfox.com and in conjunction ran a story on its local Oklahoma City television broadcast also regarding the Plaintiff. Available at: https://okcfox.com/news/local/norman-public-schools-nps-norman-high-school-teacher-summer-boismeir-house-bill-1775-hb1775-american-civil-liberties-union-aclu-first-amendment-critical-race-theories-crtbook-ban-oklahoma-state-board-of-education-race-sex-discrimination. (Ex. 6).*

    Not disputed.

12. *The article from FOX 25 contains the following quotes provided by Plaintiff: In response to unfounded calls from state leadership for widespread censorship, I did*

*share a library-linked QR code with my students. Immediately after this, I was removed from my position and placed on leave. Teachers across the district have been told by administration to either remove or restrict student access to classroom library texts for fear of a potential accreditation downgrade associated with any perceived violations of HB 1775. Let me be absolutely clear: I place the primary responsibility for this chilling of free speech and free association at the feet of Ryan Walters, Governor Stitt, and their ilk at 23rd and Lincoln.*

Not disputed.

13. *On August 23, 2022, Plaintiff was the subject of an article in Gothamist, a website affiliated with New York Public Radio Station WNYC titled "Oklahoma teacher suspended after promoting Brooklyn Public Library's anti-censorship campaign." Available at: https://gothamist.com/news/oklahoma-teacher-suspended-afterpromoting-brooklyn-public-librarys-anti-censorship-campaign (access may require a free account signup). (Ex. 7).*

Not disputed.

14. *On August 24, 2022, Plaintiff gave a videotaped interview to Oklahoma City FOX 25 which lasted nearly 20 minutes, portions of which aired on the local news and were described in a written article titled "'I am a walking HB 1775 violation':*

*Former Norman teacher discusses book ban controversy." Available at: https://okcfox.com/news/local/summer-boismier-norman-public-schools-critical-race-theory-brooklyn-public-library-qr-code-house-bill-1775-oklahoma-teacher-resigned-education-books. (Ex. 8).*

Not disputed.

15. *In the August 24, 2022, interview with FOX 25 Plaintiff stated: I am a walking HB 1775 violation. And one of the sticking points between myself and my previous district was I would do it again in a heartbeat. No regrets. Would do it again. Will do it again. Id.*

Not disputed.

16. *On August 24, 2022, the OU Daily published an article about Plaintiff titled "Norman High School teacher resigns after accusations of violating HB 1775." Available at: https://www.oudaily.com/news/norman-high-school-teacher-resigns-after-accusationsof-violating-hb-1775/article_61a5e982-23e3-11ed-89fa-63a4a1f17a95.html. (Ex. 9).*

Not disputed.

17. *In the OU Daily article, Plaintiff is quoted as stating: HB 1775 has served its purpose. Educators in our state's public schools are now required to commit*

*instructional malpractice in order to keep their jobs and feed their families. Make no mistake, the real victims here are Oklahoma public school students. This will not change until the voters of this state stop electing unqualified bigots to positions of power. Id.*

Not disputed.

18. *Also on August 24, 2022, CNN ran a story about Plaintiff titled "An Oklahoma teacher says she resigned over a state law requiring teachers to censor books in classroom libraries." Available at: https://www.cnn.com/2022/08/24/us/oklahomateacher-resigns-race-and-gender-law/index.html. (Ex. 10).*

Not disputed.

19. *In the CNN article, it is reported that Plaintiff stated to CNN that she did in fact provide a QR code to her classroom with access to the Brooklyn Public Library's "Books Unbanned" program, and Plaintiff is quoted as stating: Me commenting on the climate of censorship and the chilling implications of a rejection of free speech and free association – me commenting on that is absolutely a political choice. I stand by that. Id.*

Not disputed.

20. *Also on August 24, 2022, Plaintiff was the subject of an article in VICE News titled "This teacher gave students access to 'banned' books. She was put on leave and resigned." Available at: https://www.vice.com/en/article/oklahoma-teacher-resignedbrooklyn-library-banned-books/. (Ex. 11).*

Not disputed as to the article's title, but objectionable to any extent that Defendant wishes to use the hearsay statement the title makes for the truth of the matter asserted, since it is not fully accurate and the court has the benefit of the transcript of Plaintiff's administrative hearing before the Oklahoma Department of Education (filed with the Court as Dkt#37-3) for the direct, accurate information about Plaintiff's "removal" and resignation.

21. *In the VICE News article Plaintiff is quoted as stating: HB 1775 has created an impossible working environment for teachers and a devastating learning environment for students. For the 2nd year in a row, students at Norman High will be without a certified English teacher for a substantial amount of time. The fault for that lies with Governor Stitt and Republican state leadership. Id.*

Not disputed.

22. *On August 25, 2022, Plaintiff was the subject of an article from The Washington Post titled "Teacher quits in protest after being punished for banned-books sign."*

*Available                                                                                                            at:*

*https://www.washingtonpost.com/nation/2022/08/25/oklahomateacherresigns/.*

*(Ex. 12).*

Not disputed.

23. *In The Washington Post article Plaintiff is quoted as describing her school library*

    *as "a physical manifestation of an HB 1775 violation." Id.*

    Not disputed.

24. *On August 26, 2022, Oklahoma City FOX 25 published a story about Plaintiff*

    *titled "Norman Public Schools parent says former teacher 'should have criminal*

    *charges'" and also aired a story about Plaintiff on FOX 25 Oklahoma City*

    *television.   Available   at:   https://okcfox.com/news/local/nps-parent-says-former-*

    *teacher-should-havecriminal-charges-norman-public-schools-oklahoma-gender-*

    *queer-book-books-librarycritical-race-theory-summer-boismier-sex-explicit-*

    *pornographic-pornography-senatorrob-standridge-laney-dicksion-criminal-charge.*

    *(Ex. 13).*

    Not disputed.

25. *In regards to Gender Queer which the parent of one of Plaintiff's students identified as being on the "Books Unbanned" list the August 26, 2022, FOX 25 article quotes the parent as stating "This is pornographic material." Id.*

Not disputed as to the fact that the article contains this quotation, but objectionable to any extent that Defendant wishes to use the hearsay statement for the truth of the matter asserted.

26. *On August 31, 2022, The Oklahoman published an opinion piece by Plaintiff concerning HB 1775. (Ex. 14).*

Not disputed.

27. *On August 31, 2022, Walters posted two letters about Plaintiff on his Secretary of Education letterhead to his Twitter account. (Ex. 15. and Joint Status Report and Discovery Plan, Doc. 31, Stipulated Facts).*

Not disputed.

28. *At the time he made the statements, Walters believed that all statements in his August 31, 2022, letters were true. (Ex. 16, Declaration of Ryan Walters).*

Disputed, since this alleged fact is based only on the Defendant's self-serving denial of culpability prepared as part of litigation. This denial strains credulity due to it being inconsistent with Defendant's actions.

29. *At the time he made the statements, Walters was the Oklahoma Secretary of Education. (Joint Status Report and Discovery Plan, Doc. 31, Stipulated Facts).*

Not disputed.

30. *On September 1, 2022, Plaintiff republished a copy of Defendant Walters' letter to Plaintiff's public twitter account with the comment "No clerical errors detected." (Ex. 17).*

Not disputed.

31. *The Court's Scheduling Order [Doc. 32] established a January 5, 2025, deadline for Plaintiff to file a final list of witnesses in support of her claims. Plaintiff has not filed a witness list.*

Not disputed, with apologies to the Court. As noted in Plaintiff's Motion for Extension of Time to File (Dkt.#39) one of Plaintiff's two attorneys recently became hospitalized and died (her local counsel) and her other attorney (undersigned counsel) has been experiencing health issues severely impacting his ability to do legal work and causing the need for a transition to new counsel, which is in progress. Undersigned counsel is in communication with Defendant's counsel about getting both the witness

and exhibit list and will address the same with the Court as soon as practicable.

32. *The Court's Scheduling Order [Doc. 32] established a January 20, 2025, deadline for Plaintiff to file a final list of exhibits in support of her claims. Plaintiff has not filed an exhibit list.*

Not disputed, subject to the same note as #31, above.

## PLAINTIFF'S PROPOSED ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

1. Defendant Walters has made numerous public statements evincing or reflecting personal malice toward career educators including Plaintiff. For example, these include, but are not necessarily limited to:

    a. Publicly alleging (since 2023) that the Oklahoma Education Association, the teachers union for Oklahoma educators, including Plaintiff is a "terrorist organization." *See* https://www.fox23.com/news/new-reaction-to-state-supt-walters-calling-state-teachers-union-terrorist-organization/article_c32b84c2-e9cd-11ed-90de-1f4d0a7161c5.html.

    b. Publicly alleging that educators were responsible for the 2025 New Year's terror attack in New Orleans. *See*

16

https://www.oklahoman.com/story/news/education/2025/01/03/new-orleans-terror-attack-ryan-walters-oklahoma-video-posted-twitter-x/77441453007/.

2. Defendant Walters's statements against Plaintiff were accompanied by, and in support of, a call for specific action; namely the revocation of her teaching license so that she could never again teach. *See* https://www.oklahoman.com/story/news/education/2022/08/31/ryan-walters-calls-to-revoke-former-norman-teacher-summer-boismier-certification/65466233007/.

3. When Plaintiff's administrative hearing before the State Board of Education resulted in a finding in her favor and determined she had not broken the law or otherwise acted in violation of the requirements of her teaching license, Defendant Walters immediately promised to revoke her license anyway, without regard to evidence or analysis. *See* https://www.usatoday.com/story/news/nation/2023/06/22/no-proof-teacher-violated-oklahoma-book-law-prosecutor/70347891007/.

4. Defendant Walters made good on this threat by overriding the findings to revoke Plaintiff's teaching license. *See*

https://oklahomavoice.com/2024/06/27/oklahoma-board-rejects-judges-advice-to-keep-summer-boismiers-teaching-license-intact/.

ARGUMENT

I.    **The NY Times "actual malice" standard should not be extended beyond its legitimate scope.**

Defendant now seeks a second bite at the actual malice applicability apple. However, the Court should decline its invitation to further extend the scope of an Oklahoma state law precedent on which it now relies for its proposition that the actual malice standard should apply.

The requirement of actual malice for actionable defamation of a public figure is a judicial creation, representing a balancing of multiple important rights and interests inherent in this type of case, including of course First Amendment protections and freedom of the press. *See NY Times v. Sullivan*, 376 U.S. 254 (1966).

It should first be noted that both the key federal and state lines of precedent cited by Defendant for the proposition that the defamatory statements he made must be subject to the actual malice standard are distinguishable from the present case. Unlike *NY Times v. Sullivan*, *Rosenblatt v. Baer*, and the Oklahoma state case

*Johnston v. Corinthian TV Corp*, for example, the Defendant is an entirely different type of party—a party whose potential accountability to the tort of defamation or libel does not implicate the interests the protection of which was foundational to the aforementioned cases. *See Johnson v. Corinthian TV Corp*. 1978 OK 88, 583 P.2d 1101 (Okla. 1978); *NY Times v. Sullivan*, supra, *Rosenblatt v. Baer*, 383 U.S. 75 (1966).

As Defendant's proffered materials show clearly, this was not an article or press piece made or published by a newspaper or other media outlet as part of its press role, but rather a personal attack made by one person upon another. This renders much of the foundational analysis in NY Times and Rosenblatt inapposite to the situation in the present case, which does not implicate freedom of the press in any way by applying accountability to Defendant's personal attack on Plaintiff, made outside of any newsgathering, publication, or press role by a person who has not shown himself or argued himself to be a member of the press in any way, shape, or form.

Turning in more detail to the state law implications, *Johnston v. Corinthian* can appear to be a strong precedent at first glance since it seems to say that an educator may be presumed to be a public official by virtue of their employment, but a deeper look reveals that *Johnston* is both questionable in its jurisprudence or

applicability and indeed distinguishable. *Johnston* purports to be based on the holdings of *Rosenblatt v. Baer*, but reaches the conclusion that teachers are effectively policy makers despite the incongruity of this result with the plain holding in *Rosenblatt*. *See Johnston,* supra, cf. *Rosenblatt*, 383 U.S. at 76, ¶2). Local teachers like Plaintiff and her roughly 42,000 fellow educators bear little ability to guide and direct government policy when compared with that of Defendant, who in both his capacity as Secretary of Education and later Superintendent of Public Instruction, represents a unique statewide official with discretion for policymaking.

Johnston and Oklahoma state decisions with similar holdings, such as *Luper v. Black Dispatch Pub. Co.*, come from a common thread connecting them back to *NY Times v. Sullivan*—the need to preserve broad First Amendment protections for the press. *See also Luper v. Black Dispatch Pub. Co*, 1983 OK CIV APP 54, 675 P.2d 1028 (Okla. app. 1983). In the present case, there is no such freedom of the press issue. Instead, we are faced not with defamatory statements by the press or media, but rather by a high-profile public official and politician making them in response to criticism from a constituent.

As such, Defendant's proposed extension of this doctrine to allow broad defamation of Plaintiff Boismier and anyone employed as an educator would represent a particularly dangerous disturbance of this balance. The comments and grievances made by Plaintiff criticizing political and government policy and seeking redress from her elected officials constitutes speech that lies at the very heart of First Amendment protection. *See Buckley v. Valeo,* 424 U.S. 1, (1976); *Meyer v. Grant*, 486 U.S. 414 (1988).

This same potential disbalance and chill effect is likely to result from holding, as Defendant seeks, that Boismier's public comments warrant a loss of her normal right to seek accountability for defamation. Plaintiff's criticism about HB 1775 and the politicians such as Defendant who were using it to attack vulnerable populations like people of color and those in the LGBT community represent core First Amendment speech. This coupled with her status as a mere local educator rather than someone who was running for office, working in media or as an advocate, or who had deliberately raised their public profile in addition to the First Amendment criticism they were engaging in, renders Plaintiff rightfully subject to the same protection of her private rights as that given to the petitioner in *Gertz v. Robert Welch. See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 324

(¶3b) (1974). It must also be noted that *Gertz* features the same kind of press defendant and the same press freedom concerns at *NY Times* and its progeny that remain distinguished and absent from the present case. *Id.*

Finally, even if the Court chooses to find for Defendant on this point, the content of the defamatory communications places at least part of them outside the actual malice analysis even if the nature of the parties otherwise allows it. The actual malice standard is not apply to all possible content, but is designed to apply to statements regarding characteristics attributed "germane to fitness for office" or criticism of what the public official in question has done or failed to do in the exercise of their duties or in things related to the exercise of their duties. *Garrison v. State of Louisiana*, 379 U.S. 64, 76 (1964). In the present case, much of the defamatory impact is due not merely to falsities about what kind of person Plaintiff allegedly is or what she allegedly did, but rather what Walters falsely claimed had been done to her by Norman Public Schools. Falsely claiming that Boismier had been fired for malfeasance is plainly outside the scope of the defamatory content subject to the actual malice standard since it goes beyond criticizing or commenting about Plaintiff or her actions.

## II.    Whether Defendant acted with "actual malice" remains in dispute.

Assuming that this Court continues to respect the balance of First Amendment considerations outlined above and thus declines to now extend the actual malice standard in the way Defendant seeks, Defendant's argument that Plaintiff cannot show actual malice remains moot. But assuming for the sake of argument that the Court were to reverse direction from its previous rejection of Defendant's Motion to Dismiss and now require this standard, there remains a factual dispute for trial here rather than a cause of summary judgment.

As noted in Plaintiff's Response to Defendant's Proposed Undisputed Material Facts, the sole evidence cited by Defendant for the proposition that his false accusations were made "in good faith" is his own statement prepared for litigation. *See*, Responses, supra, at #28. The problem with relying on this is twofold:

First, this statement is inconsistent with the circumstances surrounding the defamation. As described above in #1-#4 of Plaintiff's Proposed Additional Facts Precluding Summary Judgment, Defendant's stated feelings concerning Plaintiff and other Oklahoma teachers evince clear animus on Defendant's part. *See* Plaintiff's Proposed Additional Facts, at ##1-2. This is not consistent with a good

faith, objective exercise of any government role. Moreover, the connection of the defamatory statements to Defendant's actively seeking to (and later succeeding in) bringing about the destruction of Plaintiff's ability to work, regardless of whether any actual evidence against her warranted it is likewise inconsistent with his declaration. *See* Plaintiff's Proposed Additional Facts, at ##3-4.

The second point at which this argument fails is that it only addresses one of two ways in which actual malice may be shown. Subjective assertion of good faith belief is not enough to preclude a finding of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727 (1968). While subjective intent to lie is obviously one of thee ways actual malice may be shown, the other is "reckless disregard of whether [a defamatory statement] was true or false." *Rosenblatt v. Baer*, 383 U.S. 75, 84-86 (1966).

In the present case, this recklessness is fairly clear, and in fact resembles what was found in another Oklahoma appellate case applying the actual malice standard. In *Luper v. Black Dispatch Pub. Co*., the Oklahoma Court of Civil Appeals overturned summary judgment granted to a defendant publisher even though in that case, the plaintiff educator did not object to being treated as a public official and having the actual malice standard applied. *See Luper v. Black Dispatch Pub. Co*,

1983 OK CIV APP 54, 675 P.2d 1028 (Okla. app. 1983). Like the present case, the falsity of key false allegations at issue "could have been determined by a simple telephone call…" *Id*, at ¶5. As such, even if the actual malice test is applied to the present case, its result remains at issue for trial rather than properly subject to summary judgment.

III. **Both Defendant's statements and Plaintiff's claims go beyond the scope of the Title 12, §1443.1 statutory privilege Defendant cites.**

For reasons partially overlapping with the above discussion, this argument fails on scope. First, the scope of the statutory grant of privilege in 12 O.S. §1443.1 plainly and unambiguously only purports to preclude punishment for libel. 12 O.S. §1443.1(B). Libel specific to 12 O.S. §1441 et. seq. is one among multiple formulations of Plaintiff's claims. As such, the statute would only have practical impact if exclusion of libel recovery under 1447.3 creates differences in applicable damages.

Secondly, there is no undisputed fact offered by Defendant for the proposition that the defamation here occurred pursuant to the proper exercise of an official duty. Instead, only two unconnected assertions are given which could imply or place at issue whether some or all of Defendant's communication, but hardly go

anywhere near dispositive proof of this connection to duty. *See* Defendant's Motion (Dkt.#37), at 15. Likewise, the scope of his defamatory comments went beyond criticism of Boismier, as discussed above and below, rendering them outside the scope of the potential privilege for "criticisms upon the official acts…" or Plaintiff. *See* 12 O.S. 1443.1(A).

### IV.   The Government Tort Claims Act (GTCA) is inapplicable to the present issues before the court.

In the present case, Defendant is not being sued in his official capacity as Superintendent of Public Instruction or his prior political appointment as a member of Governor Stitt's cabinet. Defendant's argument that his defamatory statements, made during the course of a political campaign for office, were some sort of government action is based solely on his statement of "good faith." As discussed above in relation to the application of the actual malice standard, this argument would only be applicable in the same scenario in which the actual malice standard had been applied AND Plaintiff had been unable to meet her burden of proof. Thus Defendant's argument on the GTCA does not provide any actionable independent basis for summary judgment.

## V. Defendant's defamatory statements allege false facts rather than remaining within the scope of opinion.

This argument fails for relatively simple and straightforward reasons; namely because Defendant Walters made and disseminated statements that clearly and unambiguously went beyond opinion to allege specific facts. Even if we assume for the sake of argument that criticism of Plaintiff herself could be merely opinion, there is no rational way to conclude that alleging that someone has committed a crime or that they have been fired for that offense are merely opinion. As discussed above in relation to the dispute over actual malice, the accusations that Plaintiff had; (1) been fired by the Norman Public Schools, for (2) distributing child pornography are statements that can be verified or debunked factually.

## VI. Defendant's defamatory statements go beyond the scope of Fair Comment Privilege.

Defendant's final argument for summary judgment—that his defamatory statements are protected by a common law defense of "fair comment," fail for the same basic reasons discussed above regarding his prior claims of privilege and opinion. As Defendant admits, the fair comment privilege requires at least three elements to be met to potentially trigger this privilege claim. It must 1) deal with a matter of public concern; 2) be based on true or privileged facts; and 3) represent the actual opinion of the speaker, but is not made for the sole purpose of causing harm." *See Magnusson v. New York Times Co.,* 2004 OK 53.

While it can be reasonably argued that the statements deal with matters of public concern, the second and third elements are lacking herein. In this case, the statements are based on false facts rather than true ones—particularly where the questions of whether Plaintiff distributed disfavored materials to students are concerned and as to whether she has been fired for malfeasance. Moreover, as noted previously, the statements went beyond opinion to include alleged objective facts that were false. As such, this argument cannot be the basis for a legitimate summary judgment.

CONCLUSION

All told, none of the alleged justifications Defendant offers for seeking summary judgment are legally or factually sufficient to allow it. As such, Plaintiff respectfully requests that this Court deny Defendant's Motion.

Respectfully submitted:

___s/ Brady R. Henderson___
Brady R. Henderson, Wis. Bar #1116435, Okla. Bar #21212
Cream City Law, LLC
1009 Glen Oaks, Ste. 109
Mequon, WI 53092
(414) 563-7453
brady@creamcity.law

**CERTIFICATE OF SERVICE**


      I, Brady R. Henderson, Attorney for Plaintiff, hereby certify that on the day of filing, I caused the above and forgoing pleading to be served on all counsel of record in this case, via filing it with the Court's CM/ECF system.


  s/ Brady R. Henderson