**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SUMMER BOISMIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-767-J |
| | ) | |
| RYAN WALTERS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**[1]

This action stems from certain public statements made by Defendant Ryan Walters during his tenure as Oklahoma's Secretary of Education.[2]  Plaintiff Summer Boismier, the target of Walters's remarks, maintains that these statements amounted to actionable defamation.  *See* (Compl.) [Doc. No. 1] at 6–7.[3]

Walters now moves for summary judgment[4] on Boismier's defamation claims, (Walters's Mot. for Summ. J.) [Doc. No. 37], to which Boismier responded, (Boismier's Resp.) [Doc. No. 43], and Walters replied, [Doc. No. 44].  For the reasons that follow, Walters's motion is granted.

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] After making the statements underlying this action, Walters was elected as Oklahoma's Superintendent of Public Instruction and assumed that office in 2023.

[3] In total, Boismier asserts claims of defamation, false representation, libel, and slander.  *See* Compl. at 6–7.  The parties previously agreed, however, that these claims are merely variations of defamation and are governed by the same legal analysis.  *See* (Order on Mot. to Dismiss) [Doc. No. 25] at 2 n.3.  And they have not since departed from that agreement.

[4] The Court previously denied Walters's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Order on Mot. to Dismiss at 1–6.  At that early stage of litigation, the Court was obligated to "take as true '[a]ll well-pleaded facts, as distinguished from conclusory allegations,' view all reasonable inferences in favor of [Boismier], and liberally construe [her] pleadings."  *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (first alteration in original) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)).

## I.    <u>Legal Standard for Summary Judgment</u>

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "when a reasonable jury could find in favor of the nonmoving party on the issue."  *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At the summary judgment stage, the district court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

"[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A movant, like Walters, who "does not bear the burden of persuasion at trial may satisfy this burden by pointing out . . . a lack of evidence on an essential element of the nonmovant's claim."  *Talley v. Time, Inc.*, 923 F.3d 878, 893 (10th Cir. 2019) (internal quotation marks omitted).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."  *Id.* at 893–94 (internal quotation marks omitted).  "These facts must establish, at a minimum, an inference of the presence of each element essential to the case."  *Id.* at 894 (internal quotation marks omitted). "The movant is entitled to summary judgment if the nonmoving party cannot provide facts to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Id.* (internal quotation marks omitted).

II.    **Background**

A.    **Undisputed Material Facts**[5]

In May 2021, Oklahoma Governor Kevin Stitt signed House Bill 1775 (H.B. 1775) into law. Now codified at Okla. Stat. tit. 70, § 24-157, the law prohibits Oklahoma schools from teaching certain concepts related to race and sex.[6] Unsurprisingly, its enactment sparked significant public controversy and debate, one in which Boismier would later become entangled. *See* Jennie A. Hill, *Legitimate State Interest or Educational Censorship: The Chilling Effect of Oklahoma House Bill 1775*, 75 Okla. L. Rev. 385, 385 (2023) (observing the "[c]ontroversy and uncertainty" surrounding H.B. 1775); Sophia Smith, *The Attack on Critical Race Theory in Schools: An Analysis of Oklahoma House Bill 1775 and Free Speech in the Classroom*, 48 Okla. City U. L. Rev. 81, 84, 92 (2023) (detailing the "public reaction" to H.B. 1775's passage and "controversy surrounding [Boismier's] compliance with H.B. 1775").

At the time of H.B. 1775's enactment, Boismier was a high school English teacher for Norman Public Schools in Oklahoma. On the first day of the 2022–2023 school year, her students arrived to find the classroom bookshelves covered in red butcher paper with a handwritten message that said: "Books the state doesn't want you to read." A QR code affixed to the paper directed students to the Brooklyn Public Library's "Books Unbanned" project, which, upon obtaining a digital library card, provides access to books—like *Gender Queer* and *Flamer*—that Oklahoma

---

[5] The Court includes only those facts that are material, supported by the summary judgment record, and not genuinely disputed. *See* Fed. R. Civ. P. 56(c). Boismier factually disputes only one of Walters's asserted summary judgment facts, though she challenges several others as irrelevant, prejudicial, misleading, and/or hearsay. *See* Boismier's Resp. at 5, 7–8, 12, 14. Notably, she attaches no evidence to her summary judgment response.

[6] The law's implementing regulations, found at Okla. Admin. Code § 210:10-1-23, delegate enforcement authority to the Oklahoma State Board of Education.

schools have removed in response to H.B. 1775. Before the first day of class, Boismier posted photos of her classroom setup to her public Twitter account,[7] accompanied by a message referencing H.B. 1775 and noting that Oklahoma leadership had labeled the covered books— particularly those by "BIPOC, LGBTQ+, and/or gender non-conforming authors"—as "pornography" and "indoctrination." She later admitted that her decision to provide the QR code was in response to incendiary comments by Walters about *Gender Queer*.[8]

After a concerned parent complained to school officials about Boismier's classroom setup, the school removed her to investigate. Within days, she resigned.

Boismier's resignation was swiftly followed by a series of news stories—from KOKH Fox 25,[9] Gothamist,[10] *OU Daily*,[11] CNN, VICE News,[12] and *The Washington Post*—published between

---

[7] Twitter has since been rebranded as X. The "social-media platform . . . allows users to electronically communicate by posting and engaging with limited-length messages called 'tweets.'" *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 494 (6th Cir. 2023).

[8] Sometime before July 28, 2022, Walters discovered that *Gender Queer* and *Flamer* were accessible to students in Tulsa Public Schools and posted images from the books—describing them as "inappropriate sexual material"—on Facebook. Walters's Mot. for Summ. J., Ex. 1 at 1. When Facebook quickly removed his post, Walters expressed displeasure that the site had "higher standards than . . . Tulsa Public Schools." *Id.*, Ex. 1 at 1. And Walters was not alone in criticizing the availability of *Gender Queer* and *Flamer* in Oklahoma public schools. On July 27, 2022, then-Superintendent of Public Instruction Joy Hofmeister publicly condemned "the presence of two obscene graphic novels potentially available at Tulsa Public Schools." *Id.*, Ex. 2 at 1. In her written statement, Hofmeister described the novels as "inappropriate, sexually explicit material" and "pornography that does not belong in any public school library." *Id.*, Ex. 2 at 1.

[9] KOKH Fox 25 is an Oklahoma City news outlet that serves as the local Fox network affiliate. Walters cites two KOKH Fox 25 stories about Boismier: one covering her resignation more generally and another spotlighting her 20-minute in-person interview with the station. *See* Walters's Mot. for Summ. J., Exs. 6, 8.

[10] Gothamist is a New York City digital news outlet.

[11] *OU Daily* is a student-run newspaper at the University of Oklahoma.

[12] VICE News is a digital news outlet that covers stories both across the United States and internationally.

4

August 23 and August 25, 2022, covering her departure from Norman Public Schools and opposition to H.B. 1775 (along with the Oklahoma politicians who supported it).  *See* Walters's Mot. for Summ. J., Exs. 6–12.  In them, Boismier was directly quoted as saying:

- "I have made the decision to resign from my position at Norman High School.  I will say that the district did offer me back my job, allowing me back in the classroom as of tomorrow morning.  However, there were some fundamental ideological differences between myself and district representatives that I just couldn't get past.  HB 1775 has created an impossible working environment for teachers and a devastating learning environment for students.  For the second year in a row, students at Norman High will be without a certified English teacher for a substantial amount of time.  The fault for that lies with Governor Stitt and Republican state leadership."  *Id.*, Ex. 6 at 2 (bolding omitted).

- "Let me be absolutely clear: I place the primary responsibility for this chilling of free speech and free association at the feet of Ryan Walters, Governor Stitt, and their ilk at 23rd and Lincoln."  *Id.*, Ex. 6 at 6.

- "I saw this as an opportunity for my kids who were seeing their stories hidden to skirt [H.B. 1775's] directive . . . .  Nowhere . . . did it say we can't put a QR code on a wall."  *Id.*, Ex. 7 at 3.

- "The legislation has done exactly what it intended, which is to stifle any discussions around systemic inequality, specifically related to race and gender.  All it takes is one person, one complaint, to put an entire district at risk . . . .  It's put Oklahoma education in a vice."  *Id.*, Ex. 7 at 3.

- "I am a walking HB 1775 violation . . . .  And one of the sticking points between myself and my previous district was I would do it again in a heartbeat.  No regrets.  Would do it again.  Will do it again." *Id.*, Ex. 8 at 4.

- "Make no mistake, the real victims here are Oklahoma public school students . . . .  This will not change until the voters of this state stop electing unqualified bigots to positions of power." *Id.*, Ex. 9 at 2.

- "The state doesn't want you to have access to these texts, these texts that center LGBTQ+ perspectives, that center BIPOC perspectives, which I believe absolutely 1,000% deserve a place in our reading lists, in individual curricula, that should be centered and protected, because they have historically been erased." *Id.*, Ex. 10 at 3.

- "Me commenting on the climate of censorship and the chilling implications of a rejection of free speech and free association—me commenting on that is absolutely a political choice.  I stand by that." *Id.*, Ex. 10 at 4.

- "This is a persistent pattern from Oklahoma legislators.  They don't want these conversations happening.  They don't want critical thinkers, they want American exceptionalism and this whitewashed version of history that does not require them to interrogate their own privilege.  That's dangerous when you're the one in charge." *Id.*, Ex. 11 at 11.

- "The one thing I would say to parents about what is happening right now is your teachers, our teachers are not the enemy.  I've been called an indoctrinator, a woke leftist, a groomer, a pedophile, all within the last several months.  Parents are being manipulated.  Just because you object to the contents of a specific text does not give you the right to restrict access from other students." *Id.*, Ex. 11 at 14.

- "I do [see myself staying in education].  I'm not looking for a fight, I'm not trying to be a martyr or anything, but the state has let our students down.  It's violated their rights and challenged their fundamental humanity if they don't check a certain box.  And if the state isn't going to stand for those students, who else is going to do it?"  *Id.*, Ex. 11 at 14.

- "[My library is] a physical manifestation of an HB 1775 violation."  *Id.*, Ex. 12 at 2.

On August 26, 2022, KOKH Fox 25 published another story on Boismier, this time featuring the perspective of a concerned mother.  *See id.*, Ex. 13 at 1–3.  The mother explained that after scanning the Brooklyn Public Library QR code her daughter had received from Boismier, it directed her to the book *Gender Queer*.  *See id.*, Ex. 13 at 2.  Deeply unsettled by the book's content, the mother characterized it as "pornographic material" and insisted that Boismier "should have criminal charges against her."  *Id.*, Ex. 13 at 2.  The following are excerpts from *Gender Queer*:





*Id.*, Ex. 5 at 1, 3, 5, 7.

Finally, on August 31, 2022, Boismier appeared as a guest columnist for *The Oklahoman*. In her piece, she criticized H.B. 1775 and called for more inclusivity in Oklahoma classrooms. *See id.*, Ex. 14 at 1–3.

This all leads to the challenged statements underlying this defamation action. On August 31, 2022, Walters posted two letters to his Twitter account:





*Id.*, Ex. 15 at 1–2.  The letters are nearly identical, except that the second removes reference to Boismier's apparent firing and clarifies that she resigned rather than face removal.

In a declaration attached to his motion for summary judgment, Walters states that he first learned of Boismier from August 2022 news reports discussing her classroom display with the Brooklyn Public Library QR code.  *See id.*, Ex. 16 at 1.  At the time, Walters knew that *Flamer* and *Gender Queer*—two books he had previously sought to have removed from Oklahoma school libraries—were available through the Brooklyn Public Library.  *See id.*, Ex. 16 at 1–2.

Walters insists that "[i]t was and is [his] opinion that these books are pornographic in nature." *Id.*, Ex. 16 at 2.  He adds that when he posted his first letter to Twitter, it was his "honest belief"—based on "public reports"—"that [Boismier] had been terminated." *Id.*, Ex. 16 at 2.  Upon learning that same day that she had resigned, he "issued the second, corrected letter." *Id.*, Ex. 16 at 2.

### B.    Statements at Issue

In her complaint, Boismier alleged that on August 31, 2022, Walters posted a letter to Twitter containing several "false or misleading statements" about her, including that she had (1) "been fired from her teaching position with the Norman Public Schools," (2) "distributed pornography to students, which would have been a serious and disturbing crime," and (3) "caused harm and shame to the entire profession of teachers by sexualizing her classroom."  Compl. at 4 (internal quotation marks omitted).  She further alleged that in a follow-up letter posted to Twitter, Walters falsely asserted that she had instead "resigned rather than face removal." *Id.* (internal quotation marks omitted).  Finally, her complaint vaguely referenced additional statements by Walters on "subsequent dates," including that she was "morally unfit to teach," "had violated Oklahoma law," and "represented a danger to minor children."  Compl. at 7.

While a plaintiff may rely on well-pleaded allegations at the motion to dismiss stage, a party opposing summary judgment must come forward with evidence sufficient to permit a reasonable jury to find in its favor. Mere allegations in the pleadings will not suffice. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) ("In the face of a properly supported motion for summary judgment, the nonmoving party may not rely upon unsupported allegations without any significant probative evidence tending to support the complaint." (internal quotation marks omitted)); *Cent. States, Se. & Sw. Areas Pension Fund v. GL & B Leasing Co.*, 874 F. Supp. 217, 218 (N.D. Ill. 1995) ("It is well settled that a party opposing summary judgment may not rely on the allegations of its pleadings.").

As it stands, the above images of Walters's letters are the only evidence of his specific commentary on Boismier. As shown, Walters stated in his initial letter that Boismier had (1) been "fir[ed]," (2) "provid[ed] access to banned and pornographic material to students," and (3) "caused such harm and shame for the entire profession." Walters's Mot. for Summ. J., Ex. 15 at 1. In his second letter, Walters reiterated the same accusations regarding access and harm and, after calling on the Oklahoma State Board of Education to immediately revoke her teaching certificate, clarified that Boismier had "resigned rather than face removal." *Id.*, Ex. 15 at 2. These are the statements the Court must evaluate for actionable defamation.

## III.    Discussion

### A.    Legal Framework for Defamation

Defamation is a state law cause of action limited by the First Amendment. *See World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1136 (10th Cir. 2006) (recognizing that "the First Amendment circumscribes liability for state defamation"). To recover for defamation in Oklahoma, a private-figure plaintiff must prove:

> (1) a false and defamatory statement, (2) an unprivileged publication to a third
> party, (3) fault amounting at least to negligence on the part of the publisher, and (4)
> either the actionability of the statement irrespective of special damage, or the
> existence of special damage caused by the publication.

*Mitchell v. Griffin Television, LLC*, 60 P.3d 1058, 1061 (Okla. Civ. App. 2002).  If the plaintiff is a "public official" or "public figure," however, the First Amendment requires an additional showing that the defamatory statement was made with "actual malice."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (applying actual malice standard to public officials); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154–55 (1967) (extending actual malice standard to public figures).  "Actual malice exists where a party publishes a defamatory statement '[1] with [actual] knowledge that it was false or [2] with reckless disregard of whether it was false or not.'"  *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002) (alterations in original) (quoting *New York Times*, 376 U.S. at 280).  Naturally, as a threshold matter, a public official or figure must first establish that the statement was false.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986) ("[A] public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation."); *Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (recognizing that while "truth was once strictly a defense, now the plaintiff must shoulder the burden in his case-in-chief of proving the falsity of a challenged statement if he is a public figure" (emphasis omitted)).  The actual malice requirement places a "formidable burden" on a plaintiff seeking to recover for defamation.  *Herbert v. Okla. Christian Coal.*, 992 P.2d 322, 328 (Okla. 1999).

Walters argues that Boismier was both a public official and a public figure when he posted about her on Twitter.  *See* Walters's Mot. for Summ. J. at 14–17.  One qualifies as a public official when she occupies a role "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental

affairs," such that "the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt v. Baer*, 383 U.S. 75, 85–86 (1966).[13]  In such cases, a defamatory statement triggers First Amendment protection if it in any way "might touch on [the] official's fitness for office."  *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964); *see also Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (explaining that actual malice is implicated where the defamatory statements "relate to . . . official conduct").

As for public figures, the Supreme Court identified two types in *Gertz v. Robert Welch, Inc.*: (1) all-purpose and (2) limited-purpose public figures.  418 U.S. 323, 345, 351 (1974).  All-purpose public figures are those who have achieved "such pervasive fame or notoriety" that they are considered public figures "for all purposes and in all contexts." *Id.* at 351.  More commonly, though—and what Walters argues here—a person becomes a public figure "for a limited range of issues" when she "voluntarily injects himself . . . into a particular public controversy."  *Id.*

In its minimal discussion of limited-purpose public figures, the Tenth Circuit has deferred to state tests for determining whether a plaintiff qualifies.  *See World Wide Ass'n*, 450 F.3d at 1136–37 (applying Utah's "two-part test to determine whether the plaintiff is a limited-purpose public figure," which requires courts first to "isolate the specific public controversy related to the defamatory remarks" and then to "examine the type and extent of the plaintiff's participation in that public controversy to determine whether, under *Gertz*, he has 'thrust [himself] to the forefront of [the] controvers[y] in order to influence the resolution of the issues involved'" (quoting

---

[13] In *Revell*, the Tenth Circuit characterized *Rosenblatt*'s language as "the test for determining whether a person is a public official under the First Amendment."  *Revell*, 309 F.3d at 1232.  Oklahoma state courts have likewise relied on *Rosenblatt* when considering whether a defamation plaintiff qualifies as a public official.  *See, e.g.*, *Yates v. Gannett Co.*, 523 P.3d 69, 76 (Okla. Civ. App. 2022).

*Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271, 283 (Utah 2005))); *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000) (quoting New Mexico state caselaw defining limited-purpose public figures); *cf. Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1192 (D.N.M. 2009) (observing that "the Tenth Circuit has not articulated a precise or well-defined test or approach to limited-purpose public-figure questions"). Oklahoma caselaw, though relatively sparse, suggests that courts should simply ask the question posed in *Gertz*: whether the defamation plaintiff "voluntarily inject[ed] himself . . . into a particular public controversy." *Gertz*, 418 U.S. at 351.

In *Martin v. Griffin Television, Inc.*, 549 P.2d 85 (Okla. 1976), the Oklahoma Supreme Court quoted *Gertz* at length and concluded that the defamation plaintiff—a pet shop owner who became the subject of news reports following complaints about animal conditions at his shop—was not a limited-purpose public figure because he neither "voluntarily inject[ed] himself into a particular public controversy" nor "attempted to engage the public's attention to influence the outcome of a public issue." *Id.* at 89.

The following year, in *Weaver v. Pryor Jeffersonian*, 569 P.2d 967 (Okla. 1977), the Oklahoma Supreme Court formally "adopt[ed] the *Gertz* test" and concluded that "unquestionably the filing of a declaration of candidacy for public office place[d] the [plaintiff] in the position of special prominence in the resolution of a public issue, that is, the election of a candidate to public office by the voting citizenry." *Id.* at 973.

Finally, in *Wright v. Haas*, 586 P.2d 1093 (Okla. 1978), the Oklahoma Supreme Court again cited *Gertz* and concluded that the plaintiff "voluntarily injected himself into the vortex of [a] public controversy" over utility rates by writing a letter to the editor of a newspaper (with the

intent that it be published) defending a civic organization, criticizing the former city attorney, and seeking to influence public opinion. *See id.* at 1096.

Actual malice notwithstanding, "statements which are opinionative and not factual in nature, which cannot be verified as true or false, are not actionable [for defamation] under Oklahoma law."[14] *Hussain v. Palmer Commc'ns Inc.*, 60 F. App'x 747, 751 n.2 (10th Cir. 2003) (unpublished) (citing *Miskovsky v. Okla. Publ'g Co.*, 654 P.2d 587, 593–94 (Okla. 1982)); *see also Magnusson v. New York Times Co.*, 98 P.3d 1070, 1076 (Okla. 2004) ("[S]tatements of pure opinion—based on stated facts or on facts known by the parties or assumed by them to exist—as a matter of constitutional law, enjoy absolute immunity . . . ."). "[I]t is for the court to determine whether a statement is one of fact or opinion." *Magnusson*, 98 P.3d at 1076; *see also Choctaw Town Square, LLC v. Kokh Licensee, LLC*, No. CIV-13-1246-F, 2015 WL 11661754, at *4 (W.D. Okla. June 18, 2015) ("[T]he determination of whether a statement is one of fact or opinion is a question of law for the court.").

### B.    Application

#### 1.    Public Official or Public Figure

Again, Walters argues that Boismier must show actual malice to prevail in this defamation action because she was both a public official and a limited-purpose public figure at the time of his Twitter posts. *See* Walters's Mot. for Summ. J. at 14–17.

---

[14] That said, if an opinion is stated as or "is in the form of a factual imperative," or if an opinion is "expressed without disclosing the underlying factual basis for the opinion, the opinion is actionable under Oklahoma law if the opinion implies or creates a reasonable inference that the opinion is justified by the existence of undisclosed defamatory facts." *McCullough v. Cities Serv. Co.*, 676 P.2d 833, 835 (Okla. 1984).

In support of public figure status,[15] Walters cites Boismier's (1) Twitter post broadcasting her classroom protest to H.B. 1775; (2) participation in "numerous interviews" immediately following her resignation from Norman Public Schools; and (3) publication of an opinion piece in *The Oklahoman*. *Id.* at 16–17. According to Walters, Boismier "thrust[ed] herself to the forefront of public controversy" surrounding H.B. 1775. *Id.* at 17.

Boismier largely sidesteps the question of whether she qualifies as a limited-purpose public figure, focusing instead on Walters's status as a non-media defendant.[16] *See* Boismier's Resp. at 18–22. As she sees it, because the Supreme Court developed the actual malice standard in cases concerning press freedom, the standard should not apply here. *See id.* Applying the heightened standard in a case involving a "high-profile public official and politician" without any journalistic function, she argues, could "chill[]" speech by individuals like her who wish to "criticiz[e] political and government policy and seek[] redress from . . . elected officials." *Id.* at 20–21; *see also id.* at 21 ("[C]riticism about HB 1775 and the politicians such as [Walters] who were using it to attack vulnerable populations like people of color and those in the LGBT community represent core First Amendment speech.").

To start, the Court is unpersuaded that a defendant's non-media status warrants a departure from the actual malice standard. While Boismier correctly observes that the Supreme Court

---

[15] In arguing that Boismier was also a public official, Walters cites *Johnston v. Corinthian Television Corp.*, 583 P.2d 1101 (Okla. 1978). There, the Oklahoma Supreme Court concluded that a public-school wrestling coach was a public official because he had such "importance in th[e] public school's athletic program for the public to have an independent interest in [his] performance." *Id.* at 1103. Because the Court concludes that Boismier was a limited-purpose public figure, it need not decide whether *Johnston* warrants a finding of public official status.

[16] In fact, though she argues that the actual malice standard should not apply in this case, Boismier makes no attempt to contest that her extensive media engagement rendered her a limited-purpose public figure.

developed the heightened standard in cases involving media defendants, *see New York Times*, 376 U.S. at 256; *Curtis Publ'g Co.*, 388 U.S. at 135, the Tenth Circuit has squarely rejected the notion that the standard applies only to defamation actions aimed at the press, *see Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1410–11 (10th Cir. 1985) (per curiam).  In *Garcia*, a school board similarly argued that the *New York Times* actual malice standard did not apply to its defamation claim because the alleged defamer, the school's former superintendent, was a non-media defendant.  *See id.* at 1407 (recounting the school board's argument that "the *New York Times* standard applies only to 'media' defendants").  But the Tenth Circuit, "analyzing *New York Times* and its progeny," concluded that "[t]he focus . . . in determining whether actual malice is required . . . must be on the subject of the speech, not on the identity of the speaker."[17]  *Id.* at 1408, 1410.  "To withhold the protections of the first amendment from nonmedia participants in the political process," it reasoned, "would . . . stand the amendment on its head without the slightest justification."  *Id.*  Other federal courts are in accord.  *See, e.g.*, *Dehne v. Avanino*, 219 F. Supp. 2d 1096, 1108 (D. Nev. 2001) ("reject[ing] the notion that the *New York Times* standard is limited solely to private defamation suits brought by a public official made or published in the media"); *Hammerhead Enters., Inc. v. Brezenoff*, 551 F. Supp. 1360, 1369 (S.D.N.Y. 1982) ("The *New York*

---

[17] The court found especially significant the Supreme Court's refusal in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), to limit the actual malice standard to media defendants.  While Justice Powell, writing for the Court, did not reach the issue, five members of the *Dun* Court rejected any distinction between media and non-media defendants. In dissent, Justice Brennan, joined by Justices Marshall, Blackmun and Stevens, reasoned that "[s]uch a distinction is irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.'" *Id.* at 781 (Brennan, J., dissenting) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978)).  Similarly, Justice White, in his concurrence, expressed "agree[ment] with Justice Brennan that the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech." *Id.* at 773 (White, J., concurring); *see also id.* ("None of our cases affords such a distinction; to the contrary, the Court has rejected it at every turn.").

*Times* actual malice standard has not been expressly limited to cases involving media defendants. Moreover, the *New York Times* standard has been employed on behalf of non-media defendants even though the issue was not explicitly decided." (internal citation omitted)); *cf. Carroll v. Trump*, 680 F. Supp. 3d 491, 517 (S.D.N.Y. 2023) (discussing required showing of actual malice for plaintiff's defamation claims against President Donald Trump).

Nor is the Court persuaded that applying the actual malice standard in this case will broadly "chill" criticism of government policy and elected officials. Boismier is not on trial for her public criticisms, and individuals—whether on social media, message boards, or other expressive outlets—will continue to enjoy wide latitude to critique public officials, whether motivated by noble or ignoble aims. Indeed, the very rationale underlying the heightened actual malice standard supports this broad protection: those who assume public roles naturally invite "public scrutiny and discussion." *Rosenblatt*, 383 U.S. at 86 n.13; *see also Gertz*, 418 U.S. at 345 (observing that "public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them").

But the distinction here is that Boismier did not speak out as a private figure swept unwillingly into a public controversy; she "voluntarily inject[ed]" herself to the forefront of debate over H.B. 1775 and its impact on classrooms like hers. *Gertz*, 418 U.S. at 351. Before Walters's tweets, Boismier had already transformed her classroom into a visible protest against H.B. 1775 and posted about it on Twitter—by her own admission, motivated by Walters's commentary on *Gender Queer*. Then, on the heels of her resignation, she actively facilitated media coverage of her departure from teaching and opposition to H.B. 1775, providing direct quotes to numerous outlets and offering extended commentary in at least two question-and-answer interviews. Finally, on the very day Walters tweeted about her, she appeared in an Oklahoma daily newspaper to voice

further frustrations about H.B. 1775 and call for change in local schools.  There can be little doubt that Boismier actively used the media as a vehicle to influence public sentiment regarding H.B. 1775's effect on education in Oklahoma.  And the Court finds that this conduct rendered her a limited-purpose public figure on the issue of H.B. 1775's interplay with her teaching career in Oklahoma.  *See Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 41–45 (D.D.C. 2002) (finding female pilot was a limited-purpose public figure after extensive media coverage and her voluntary statements to media about the role of women in military combat); *Anaya*, 626 F. Supp. 2d at 1211–14 (D.N.M. 2009) (finding procurement agent for government-run defense lab was a limited-purpose public figure after she and her attorney initiated media campaign to publicize exonerating information).  *But see Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157, 166 (1979) (finding subject of book was not a limited-purpose public figure because, although he attracted media attention, he was "dragged unwillingly into the controversy" and took no steps to influence public perception).

Briefly, Boismier argues that even if the Court finds she qualifies as a limited-purpose public figure, she need not show that Walters's statement regarding her alleged termination was made with actual malice.  *See* Boismier's Resp. at 22.  In doing so, she relies on Supreme Court precedent suggesting that for public officials, the actual malice standard applies only to statements "germane to [their] fitness for office."  *Garrison*, 379 U.S. at 77.  In her view, the claim that she "had been fired for malfeasance is plainly outside the scope of the defamatory content subject to the actual malice standard since it goes beyond criticizing or commenting about [her] or her actions."  Boismier's Resp. at 22.

For starters, it is difficult to see how a termination for malfeasance would be irrelevant to one's fitness for office.  But in any event, the Court has found Boismier to be a limited-purpose public figure.  In such cases, a showing of actual malice is required when the defamatory statement

relates to the "particular controversy," the scope of which is determined by "looking to the nature and extent of [the public figure's] participation." *Gertz*, 418 U.S. at 352; *see also Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 927–28 (9th Cir. 2022) (considering "whether the alleged defamation is related to the plaintiff's participation in the controversy" (internal quotation marks omitted)); *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (same).

In a nutshell, the question in this context is whether the challenged statement relates to the controversy giving rise to the plaintiff's public figure status. While Boismier does not attempt to delineate the scope of the particular controversy here, the Court finds that Walters's statement regarding her apparent termination falls within the scope of the particular controversy surrounding H.B. 1775. Boismier herself publicly framed her departure from Norman Public Schools—and, by implication, any termination—as a direct consequence of ideological conflict over the law. Therefore, Walters's characterization of her departure, whether accurate or not, directly relates to the public dispute over educational censorship and teacher autonomy sparked by H.B. 1775, a controversy in which Boismier was an active and visible participant. Accordingly, Boismier must demonstrate that Walters acted with actual malice in making this and the other challenged statements in his August 31 Twitter posts.[18]

---

[18] In her response, Boismier appears to bank on the Court's earlier rejection of public figure status at the motion to dismiss stage, going so far as to claim that applying it now would amount to a "reverse [in] direction." Boismier's Resp. at 23. Quite the contrary, the Court noted in its prior ruling that the record was "simply insufficient to determine whether [Boismier] qualifie[d] as a limited-purpose public figure." Order on Mot. to Dismiss at 4; *see also id.* (noting that the record at that stage contained "little to no evidence of [Boismier's] reportedly notable departure from teaching"). And it expressly stated that "if the case proceed[ed] to summary judgment or trial, more factual development may show that [she] qualifies as a public figure." *Id.*

### 2.     Actual Malice

Having determined that Boismier qualifies as a limited-purpose public figure, the Court turns now to whether she can establish actual malice.  When the subject of the defamatory statement is a public official or figure, "[b]oth the Supreme Court and Oklahoma state courts have held that . . . [she] must prove actual malice [at trial] with 'convincing clarity.'" *Talley*, 923 F.3d at 894 (quoting *New York Times*, 376 U.S. at 285–86; *Colbert v. World Publ'g Co.*, 747 P.2d 286, 291 (Okla. 1987)).  And "[t]he Supreme Court has said courts 'must bear in mind' this heightened burden of proof when ruling on a defendant's motion for summary judgment." *Id.* (quoting *Anderson*, 477 U.S. at 254).  "If the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence, then there is no genuine issue and summary judgment is appropriate." *Id.* (brackets and internal quotation marks omitted).  "To be sure, a defamation plaintiff seeking to resist summary judgment on the issue of malice—whether the publisher of the statement knew it to be false or acted with reckless disregard of its truth—bears a heavy burden." *Spaceon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1055 (10th Cir. 2013) (Hartz, J., dissenting).

At a minimum, actual malice "requires . . . that the statements were made with a reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).  And though the Supreme Court has acknowledged that the concept "cannot be fully encompassed in one infallible definition," *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968), it has nevertheless made clear that a defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," *Garrison*, 379 U.S. at 74, or must have "entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731.

"A 'reckless disregard' for the truth . . . requires more than a departure from reasonably prudent conduct." *Harte-Hanks*, 491 U.S. at 688.  Simply showing that "a reasonably prudent person would have conducted further investigation prior to publishing" is not enough.  *Revell*, 309 F.3d at 1233 (internal quotation marks omitted); *see also Harte-Hanks*, 491 U.S. at 688 ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.").  In the end, "[t]he standard is a subjective one— there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Harte-Hanks*, 491 U.S. at 688 (ellipses and internal quotation marks omitted).

Predictably, Walters leans heavily on his declaration to show that he lacked the subjective state of mind required for actual malice.  *See* Walters's Mot. for Summ. J. at 17–18.  And he adds that Boismier has no such evidence, pointing to her failure "to identify a single witness or exhibit she plans to introduce at trial in this case."[19]  *Id.* at 18.

In response, Boismier argues first that Walters's declaration is "inconsistent with the circumstances surrounding the defamation," pointing to Walters's conduct after his August 31 Twitter posts that, in her view, shows he harbored "animus" toward her and teachers more generally.[20]  Boismier's Resp. at 23; *see also id.* at 14 (framing Walters's declaration as a "self-serving denial of culpability prepared as part of litigation," which "strains credulity due to it being

---

[19] Walters is correct on this point.  Despite the Court's scheduling order setting a January 2025 deadline for Boismier to file her witness and exhibit lists, she has filed neither and has not sought an extension.

[20] Boismier does not attach copies of the news articles she cites as evidence of this conduct.  Instead, she includes hyperlinks within the body of her response.  Some of the linked articles appear to be inaccessible without a subscription.

inconsistent with [his] actions"). She insists broadly that this animus is "not consistent with a good faith, objective exercise of any government role." *Id.* at 23–24.

Boismier next invokes *Luper v. Black Dispatch Publishing Co.*, 675 P.2d 1028 (Okla. Civ. App. 1983), to argue that Walters acted with reckless disregard for the truth, suggesting that falsity "could have been determined by a simple telephone call." Boismier's Resp. at 25 (ellipses omitted) (quoting *Luper*, 675 P.2d at 1030). She does not identify which of Walters's statements she believes could have been disproven in this way, though the most reasonable inference is that she is referring to Walters's claim that she had been fired from Norman Public Schools.

Beginning with that statement, the Court finds that Boismier has failed to present sufficient evidence from which a rational finder of fact could conclude, by clear and convincing evidence, that Walters acted with actual malice. To be sure, Walters often engages in pointed and provocative rhetoric—particularly when responding to those he perceives as opposing his agenda. One need look no further than the news stories cited in Boismier's response. In one, Walters is recently described as linking the 2025 terrorist attack in New Orleans, Louisiana, to educational instruction in public schools. *See* Boismier's Resp. at 16.

But what is lacking from Boismier is any genuine explanation of how Walters's post-August 2022 conduct—some of which occurred as recently as 2025—establishes that he spoke with actual malice when stating that Boismier had been terminated. To the extent this history suggests some degree of "ill will, hatred or a desire to injure" Boismier, that alone "is not enough to establish actual malice." *Herbert*, 992 P.2d at 329 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 10–11 (1970); *Garrison*, 379 U.S. at 73–74).

Nor does Boismier's reliance on *Luper* advance her case. There, the Oklahoma appellate court found summary judgment improper because evidence suggested the newspaper editor acted

with actual malice in publishing two defamatory stories.  *See Luper*, 675 P.2d at 1033–34.
Boismier highlights language in the opinion criticizing the newspaper editor's failure to confirm
the initial story's allegations with what the court described as a "simple telephone call."  *Id.* at
1030.

But the court did not base its conclusion merely on that failure to investigate.  Rather, it
stressed that the editor published the initial article repeating "scandalous" allegations from an
obviously disgruntled source, the plaintiff's "bitter ex-husband," without taking even minimal
steps to verify them.  *Id.*  Then, after the plaintiff personally informed the editor that the allegations
were false, that her ex-husband had "been committed to a mental hospital," and that she did not
want further stories published, the editor went on to publish a second article.  *Id.*  That article
introduced "even more patently scandalous material" supplied from the same "outrageous liar and
embittered ex-husband," despite the editor having "ample reason to doubt the veracity."  *Id.* at
1034.  It was this course of conduct, not a mere failure to investigate, that warranted a trial on the
issue of actual malice.  *See id.* at 1033 (recognizing that "[f]ailure to investigate or inadequacy of
investigation alone does not constitute actual malice"); *id.* at 1034 ("Had the first publication been
the *sole* publication, we have serious doubts that it, alone, could withstand the rigorous First
Amendment tests set forth in the controlling federal decisions.  However, the second publication,
taken together with the first, supplies circumstantial proof not otherwise independently inferable
from the first." (emphasis in original)).

In this case, Boismier does not directly challenge the specific substance of Walters's
declaration or his asserted reliance on public reports of her termination.  Instead, she insists that
his failure to make even minimal efforts to verify whether she had, in fact, been terminated
amounts to reckless disregard for the truth.  Perhaps a more responsible or reasonable public

official would have—and as a matter of public trust, should have—done more to verify his claim before taking to Twitter. But that failure, standing alone, does not warrant a jury trial. Notably, too, when Walters was advised later that same day that his statement was incorrect, he, unlike the editor in *Luper*, promptly issued a revised letter clarifying that Boismier had resigned. This further weighs against an inference of actual malice.[21] *See Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020) ("[R]eadiness to print a retraction weighs against 'malice.'" (quoting *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987))); *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) (indicating that a prompt retraction "is significant and tends to negate any inference of actual malice"), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978); *Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2017 WL 2483800, at *8 (E.D.N.C. June 7, 2017) ("[T]he post-publication process could speak to defendants' good faith in publishing the original article.").

The Court reaches a similar conclusion regarding Walters's statement that Boismier provided her students access to banned and pornographic material. Walters argues as a threshold matter that this statement was "reasonable and . . . substantially true," Walters's Mot. for Summ. J. at 21, and while the Court is hesitant to wade into the murky waters of what is and isn't pornographic material, it cannot ignore that the imagery in *Gender Queer* arguably lends itself to

---

[21] Though she does not address the issue in her response, Boismier alleges in her complaint that Walters's statement that she resigned "rather than face removal" was false because her resignation "was not connected to any agreement, plan, or means to avoid or prevent discipline or termination, and none was pending against her." Compl. at 4. But in the very first line of Walters's public letter, he expressly called on the Oklahoma State Board of Education "to revoke her teaching certificate immediately." Walters's Mot. for Summ. J., Ex. 15 at 1. That alone suggests that the prospect of removal was looming, even if no formal proceedings had yet begun. And because Boismier is a limited-purpose public figure, she must still establish that Walters made the statement with actual malice. In the end, Walters's prediction proved accurate: the board voted unanimously to revoke Boismier's teaching certificate. *See* Boismier's Resp. at 17.

such a characterization.  At least in the context of child pornography, the Supreme Court has loosely defined the term as "sexually explicit visual portrayals that feature children."  *United States v. Williams*, 553 U.S. 285, 288 (2008); *see also Pornography*, Black's Law Dictionary (12th ed. 2024) (defining "pornography" as "[m]aterial (such as writings, photographs, or movies) depicting sexual activity or erotic behavior in a way that is designed to arouse sexual excitement," while acknowledging that the term is "notoriously difficult to define").  And while the images from *Gender Queer* may not include children, they do appear to depict graphic sexual activity.  *See supra* at 7–8.

But even assuming Walters's statement is one of verifiable fact—and even if an infallible arbiter were to conclude that *Gender Queer* does not meet the definition of pornographic material—the closeness of the question weighs heavily against a finding of actual malice.  Where the line between what is and isn't pornographic is so imprecise, the Court has trouble concluding that Walters's characterization, however controversial, reflects an inference of known falsity or a reckless disregard for the truth.  This is especially so when others, including Oklahoma's then-Superintendent of Public Instruction, were denouncing the book in the same way.  *See supra* at 4 n.8.

Finally, the Court concludes that Walters's accusation that Boismier "caused such harm and shame to the entire profession" is not actionable for defamation.  "[S]tatements of pure opinion—based on stated facts or on facts known by the parties or assumed by them to exist—as a matter of constitutional law, enjoy absolute immunity" under the First Amendment.  *Magnusson*, 98 P.3d at 1076.  While there is no definitive test for distinguishing between fact and opinion, courts generally consider the "(1) specificity and precision of the disputed statement; (2) verifiability; (3) literary and social context in which the disputed statement was made; and (4)

public context." *Choctaw Town Square*, 2015 WL 11661754, at *4 (applying factors from *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302–03 (8th Cir. 1986)).

Applying these factors here, the Court finds the statement plainly non-actionable. It lacks specificity or precision, offers no concrete claim about what harm was caused or how the profession as a whole was impacted, and is not verifiable in any objective sense. It reflects, instead, Walters's rhetorical judgment about a public controversy in which both he and Boismier were outspoken participants. And in the broader context of political discourse surrounding H.B. 1775, the remark reads as subjective commentary, not a factual assertion susceptible to defamation liability. Indeed, the Court can only imagine what a trial would look like testing whether the teaching profession, in fact, felt "shame," and whether Boismier was the one who caused it.

## IV. <u>Conclusion</u>

Having disposed of all of Walters's challenged statements, the Court finds that summary judgment is warranted. As a final parting note, the Court does not suggest that Boismier or anyone else should be dissuaded from speaking loudly and passionately about causes in which they believe. She, like all others, is free to publicly disagree with this state's politicians, subject to the protections and limits of the First Amendment. But when one voluntarily steps out from the shadows of private life to speak on a matter of public controversy, the Supreme Court has made clear that the burden to prevail in a defamation action is a formidable one. And here, the Court concludes that Boismier has not met it.

For these reasons, Walters's motion for summary judgment [Doc. No. 37] is GRANTED. A separate judgment will follow.

IT IS SO ORDERED this 10th day of April, 2025.

                    BERNARD M. JONES
                    UNITED STATES DISTRICT JUDGE